[Civ. No. 43563. Second Dist., Div. Five. Apr. 30, 1975.]

LOU SZAMOCKI, Plaintiff and Appellant, v.
DONALD PAUL SZAMOCKI, Defendant and Respondent.

## COUNSEL

Thompson, Talbott, Lemaster & Taylor and L. Guy Lemaster, Jr., for Plaintiff and Appellant.

F. Gordon Chytraus for Defendant and Respondent.

## OPINION

**ASHBY, J.**—Petitioner (appellant) appeals from the granting of respondent's motion to quash writ of execution.

Appellant and respondent had been married. A son was born to them on September 30, 1961. Appellant obtained an interlocutory judgment of divorce on September 20, 1963, which became final on October 23, 1964. Respondent was ordered to pay $25 a week for support of the child commencing August 2, 1963, and continuing until further order of the court. The right of reasonable visitation was reserved to respondent. Respondent remarried in November 1964. Appellant remarried in June 1968.

In his declaration filed November 23, 1971, in support of the motion to quash, respondent declared: "I commenced paying the Twenty Five Dollars ($25) per week child support pursuant to the order of the court on August 2, 1963, and continued paying this support up until January 26, 1969. Meanwhile, all during that same time period, I exercised my rights of visitation by visiting with my son on weekends agreed upon throughout that period. Meanwhile, in November, 1964, I remarried and have two (2) children of my new marriage, Kristy, age five, and Kelly, age two. Also, in June, 1968, my ex-wife, Lou Szamocki, remarried. [¶] Then, on or about January 25, 1969, I telephoned my ex-wife to arrange

for the next visitation on the following Sunday. I also mailed to her then current address, i.e. 669 Colgate Place, Claremont, California 91711, the latest support check for my son. There was no answer to this call. For the next few days, I made many calls to the address and received no answer at any time. Then, on or about February 2, 1969, I went directly to my ex-wife's home to pick up my son for visitation and at that time found, among other things, the following: my unopened letter of the latest support payment in the mail box, a 'for sale' sign posted on the premises, an empty house. [¶] During the following month, I made various attempts to try and locate the whereabouts of my ex-wife and son such as the following: when I contacted neighbors in the neighborhood on Colgate Place, I was advised that none of them had received any word whatever from her as to her new address; when I contacted the real estate agency, that had the sign posted for the sale of the premises, I was advised that they were given specific orders 'not to divulge the owner's whereabouts'. One of the neighbors advised me that my ex-wife and her husband and my son had 'left in the night on January 25, 1969 to some undisclosed destination'. This same neighbor also stated that my ex-wife had said she 'didn't want her ex-husband to know her whereabouts'. [¶] Then, for almost two years, I had no information whatever, directly or indirectly, from any source as to her whereabouts or the whereabouts of my son, Donald, nor did I have any idea whatever as to whether they were yet in the State of California or elsewhere. At no time during these months of checking with neighbors and mutual friends and other previous contacts of my ex-wife was I able to obtain any information whatever as to where she had gone. Then on October 1, 1970, I received a letter from the State of Connecticut Welfare Department in Hartford, Connecticut (. . .).[1] On October 8, 1970, I responded to this letter; on October 14, 1970, I received further contact from the Welfare Department; on January 19, 1971, I received my last contact from this Department; on February 4, 1971, I received contact directly from the Probate Court, Town of Hartford; then on February 17, 1971, I received my last contact from this court (. . .). [¶] Then there was no contact whatever until Saturday, October 23, 1971, upon which date I received a notice through the mail of a writ of execution issuing from the above entitled case in a total sum of child support seeking Three Thousand Twenty Five Dollars ($3,025). (. . .) Additionally, on that date, upon opening my check envelope, I discovered that there had been a withhold on my pay check in the sum of One Hundred Sixty Eight and 19/100 Dollars ($168.19). Then again, on my next week's check of Friday,

---

[1]Omission marks within this quotation indicate references to attachments to the declaration.

October 29, 1971, there was a similar withhold. [¶] I declare that I still do not know the address of my wife and son, nor do I know whether or not they are even in the State of California."

In a declaration filed January 4, 1972, on her behalf,[2] appellant declared as follows: "That in approximately June, 1968, she married Robert J. Uzdarwin. That after that time, she spent her honeymoon with Mr. Uzdarwin in Windsor, Connecticut where his parents reside. That she told Donald Szamocki, respondent, where she was going, the fact that her husband's parents lived in Windsor, Connecticut, and that was to be the place of their honeymoon. From then on until January 1969, she saw the respondent occasionally when he would visit with the child, Donald Paul Szamocki, Jr., discussed with him at various times the fact that Mr. Uzdarwin wanted to adopt their son, and had known him for three or four years. [¶] That in January, 1969, her husband, Mr. Uzdarwin obtained better employment, and due to the depressed state of the labor market in California, decided to move there. She advertised the house for sale, in which she lived, and a for sale sign was present on the premises for over one month. That during the time said for sale sign was on the premises, Mr. Szamocki did visit at the residence. [¶] That about the last week of January, 1969, she and Mr. Uzdarwin and Donald Paul Szamocki, Jr., moved to Windsor, Connecticut. [¶] She left word with the real estate broker to forward all of her mail, and had left the instructions for the real estate broker to pick up the mail from the mail box and foward [sic] it to her in Windsor, Connecticut. She received many pieces of mail from the broker, but never any communication from the respondent. She enrolled the young child in school in Connecticut under his proper name, transferred all of his records from his present and local place of school in California. [¶] That when enough time had elapsed so that Mr. Uzdarwin could file the Petition for Adoption, she gave the name and address of the respondent, Donald Szamocki, to the State Welfare Department in Connecticut so that they could contact Mr. Szamocki and obtain the proper form of consent for the adoption. [¶] That she was told by the Welfare workers that they were in contact with

[2]This declaration was filed by appellant's attorney who stated therein as follows: "I, L. Guy Lemaster, Jr., state that I am an attorney duly licensed to practice law in the State of California, and one of the attorneys for the petitioner in the above entitled matter. That I have discussed this case fully with petitioner, and she has stated the facts to me as set forth in the declaration herein. That petitioner resides out of the County of Los Angeles, State of California, in the State of Connecticut, and for that reason, make this declaration on her behalf; that I have read the foregoing declaration, and know the contents thereof, and the same are true of my own knowledge, except as to those matters which are therein stated upon my information and belief; and as to those matters, I believe it to be true."

Mr. Szamocki, that he was not contesting the adoption. [¶] That she now understands that Mr. Szamocki told the Welfare Department that there was some sort of a warrant for her arrest in California and this is the first and only time she has ever heard of such a statement, and further does not know of any reason or ever heard of the fact of any warrant being issued for her arrest. [¶] That she did not hide the child, nor did she and Mr. Uzdarwin hide, and that Mr. Szamocki at all times knew that their contacts were in Windsor, Connecticut, and they could easily be located there. In fact, she understands that Mr. Szamocki's family lives in Massachusetts, that his relatives, or at least one of his relatives is the Chief of Police in a town nearby, and that if he had wanted to find her, a simple telephone call would have located her. [¶] She believed at all times that Mr. Szamocki was just not interested since he did not argue with the idea of Mr. Uzdarwin adopting yound [*sic*] Donald. That she understands that the Welfare worker extended for a period of almost four months the time for Mr. Szamocki to respond to her Petition for Adoption in the State of Connecticut, and that he did not make any appearance at the hearing, nor did he in any way contest the matter of the adoption. [¶] That she did not receive any mail from Mr. Szamocki at any time after moving, nor was she contacted by him, nor did she receive any of the support as stated in her Affidavit for Issuance of Writ of Execution. . . ."

No testimony was taken by the trial court. The matter was heard only on the declarations set forth above. The trial court granted the petition to quash the writ of execution on the following grounds: (1) "[T]he action of the petitioner in removing the minor child from the State of California, and having that child adopted by her present husband, over objection of respondent,[3] gives to her the status of unclean hands in this Court's eyes," and (2) "this petitioner's delay in seeking to recover these

---

[3] The record does not establish that respondent objected to the adoption. In his October 8, 1970, letter to Miss Abuza of the State of Connecticut Welfare Department, respondent said: ". . . I am extremely reluctant to agree to being removed as my son's guardian. Needless to say, nothing would make my wife and me happier than to have complete custody of my son, to raise along with our two little girls. I would hate to relinquish any chance of this ever happening." In her January 19, 1971, letter to respondent, Miss Abuza stated as follows: "Your letter of October 8, 1970 did not make a definite statement as to whether you wished to contest the action to have you removed as your son's legal guardian. [¶] For that reason I am writing to let you know that my report will be sent to Probate Court in a week or so and I am requesting the judge to let you know the date of the hearing so that if it is your wish to be present or to be represented by counsel you will have time to make arrangements." Respondent's only contact with the Welfare Department was by his October 8, 1970, letter. He did not appear at the hearing nor in any other way indicate objection to the adoption proceedings.

sums of money from February 1969 to the date—the writ of execution was issued September 30, 1971—is, and this Court finds, is laches and specifically the Court finds petitioner is not seeking to recover funds for benefit of the children because she has supported the children or at least has not made any claim they are in need from February of '69 to September 1970."

We agree that the writ of execution should be quashed but we do not agree with the reasons set forth by the trial court.

■ Under Code of Civil Procedure section 681, a wife is entitled to enforce her right of execution upon any installments of support that have accrued within 10 years of the date of her application for the writ. This right is not subject to the defense of laches nor can the amount be modified. (*DiMarco* v. *DiMarco,* 60 Cal.2d 387, 393 [33 Cal.Rptr. 610, 385 P.2d 2]; *Di Corpo* v. *Di Corpo,* 33 Cal.2d 195, 201 [200 P.2d 529]; *Moniz* v. *Moniz,* 241 Cal.App.2d 74 [50 Cal.Rptr. 267]; *Stevens* v. *Stevens,* 88 Cal.App.2d 654, 655 [199 P.2d 314]; *Faust* v. *Faust,* 103 Cal.App.2d 755, 759 [230 P.2d 408].) The only discretion the court has in granting a writ of execution as to accrued installments is to condition issuance of the writ on noncompliance with an order to discharge accumulated arrearages. (*Messenger* v. *Messenger,* 46 Cal.2d 619, 630 [297 P.2d 988]; *Moniz* v. *Moniz, supra,* 241 Cal.App.2d 74, 76.)

■ Removal of children from the state without the consent of the noncustodial parent or the court is not approved even where the judgment of dissolution does not specifically require the custodial parent to reside in California. However, absent a showing that the purpose of the removal was to deprive the noncustodial parent of visitation rights, removal from the state in itself is not sufficient cause to deny the collection of installments of support which accrued during the period of that removal. (*Ernst* v. *Ernst,* 214 Cal.App.2d 174 [29 Cal.Rptr. 478]; *McNabb* v. *McNabb,* 47 Cal.App.2d 623 [118 P.2d 869].)

■ Nevertheless, under the circumstances of the instant case, we hold that the trial court did not err in granting the writ to quash. Any conflicts in the evidence are resolved in favor of respondent.

*Kaminski* v. *Kaminski,* 8 Cal.App.3d 563 [87 Cal.Rptr. 453], is in point. In that case, Richard and Sonja Kaminski were married in California and thereafter moved to Wisconsin where a child was born to them in 1957. They separated sometime after March of 1960. Richard then

returned to California. Sonja obtained a default judgment of divorce in Wisconsin in April 1962 which provided that Richard would have reasonable visitation rights and would be required to pay $10 a month alimony and $10 a week child support. Richard never made any payments required by the divorce judgment and Sonja at no time requested payment. At sometime after the divorce but prior to April 1963, Richard was told by Sonja's father that she would not permit him to see the boy. Sonja rejected Richard's effort to arrange health and dental insurance for the boy. In April 1963, Richard telephoned Sonja and asked to speak to the boy. Richard testified to that conversation as follows: "She said, ' "As far as you're concerned, you're dead. He has no father and he thinks you're dead. Let's leave it that way." ' Richard insisted on talking to his son who then came on the phone and said, ' "Hello, I don't want to talk to you." And that was the extent of the conversation.' Sonja returned to the telephone saying, ' "See? Now, just stay out of my life and leave me alone. *I don't want anything from you at all.*" ' " (8 Cal.App.3d at p. 565; italics in original.)

Sonja remarried in June 1963, and in 1966 adoption proceedings were commenced by her husband and the adoption was granted over Richard's objection. In April 1967, Sonja filed an action in California to collect unpaid support. This was Richard's first knowledge that she was making a claim for support. The Court of Appeal affirmed the trial court's decision that Sonja was estopped from enforcing accumulated unpaid support payments, holding that: "From the evidence we must assume that the trial court concluded that Sonja by stating 'I don't want anything from you at all,' while denying to Richard his court-granted visitation rights, waived any claim for money under the divorce judgment."[4] (*Id.* at p. 565.)

We reach a similar result in the case at bench. Appellant cannot play hide-and-seek with respondent and then recover support payments for that period of time during which she successfully kept her whereabouts unknown to him. If actions speak louder than words, the instant case is stronger on its facts than *Kaminski.* Here respondent paid child support of $25 a week from August 1963 until January 26, 1969. The evidence shows that appellant left California without notice to respondent. She does not even allege that she told him she was leaving or where she went.

[4]In so holding the court also rejected Sonja's contention that support payments for the benefit of a child cannot be waived by the custodial parent. (Also see *Graham* v. *Graham*, 174 Cal.App.2d 678 [345 P.2d 316]; *Hunter* v. *Hunter*, 170 Cal.App.2d 576 [339 P.2d 247].)

In her declaration she merely states that she once had told respondent that her present husband was from Windsor, Connecticut, and that he could have deduced from that information that she might be there, and also that "[i]n fact, she understands that Mr. Szamocki's family lives in Massachusetts, that his relatives, or at least one of his relatives is the Chief of Police in a town nearby, and that if he had wanted to find her, a simple telephone call would have located her." Appellant does not deny that she told a neighbor that she did not want respondent to know where she went or that the realtor had been given orders not to divulge her whereabouts.

There is no evidence of any direct contact by appellant at any time after January 1969. Respondent was not contacted by appellant concerning the adoption of his son, but rather by the State of Connecticut's Welfare Department. Appellant did not demand support payments from respondent even after the adoption. She merely had his salary attached after the adoption proceedings became final.[5]

Based on all the circumstances, respondent was justified in assuming that appellant wanted no further contact with him nor any further support payments from him. In the absence of some indication that she desired further support payments, he was not required to track her down in order to press that money upon her.

The judgment is affirmed.

Stephens, Acting P. J., and Hastings, J., concurred.

---

[5]Respondent's unsubstantiated and less than gallant allegations that there were warrants out for appellant in "several cities in Southern California" very well could have inspired appellant's belated attempt to collect accrued support installments.