[No. B004680. Second Dist., Div. Six. Jan. 8, 1985.]

GLENDA LEE SOLBERG, Plaintiff and Appellant, v.
WILLIAM GLEN WENKER, Defendant and Respondent.

476

**Counsel**

John K. Van de Kamp, Attorney General, Norman H. Sokolow and Andrew D. Amerson, Deputy Attorneys General, for Plaintiff and Appellant.

Joel S. Crosby for Defendant and Respondent.

## OPINION

**STONE, P. J.**—Glenda Lee Solberg appeals an order quashing a writ of execution by which she sought to collect child support arrearages from Mr. Wenker. We affirm the order.

The evidence presented at the hearing, viewed in the light most favorable to the judgment (*Denham* v. *Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193]) established the following:

In early 1971 or 1972, Mr. Wenker came home from work one day and discovered that his wife had left him and had taken their two daughters (ages seven and nine) with her. She moved out of the Washington town where they lived and left no forwarding address.

Throughout the next few years, Mr. Wenker attempted to locate his children, always without success. The police informed him that his problem was a "civil matter"; the courts did not respond to his communications; Ms. Solberg's mother told him that "[i]f Glenda wanted [him] to know where the kids were, she would tell [him] herself."

The next time Mr. Wenker saw his children was in 1973 or 1974, after he had moved to Santa Barbara. Ms. Solberg, her new husband and the girls were passing through town. She called Mr. Wenker and he was able to visit with his daughters for about an hour at a coffee shop while the family had breakfast.

In May of 1976, the Santa Barbara County District Attorney's office, child support division, opened a nonwelfare "URESA" case on Mr. Wenker,[1] and attempted to locate him. In July of 1977 Mr. Wenker responded to their request that he come to the office to discuss the matter. He was not represented by counsel and was suffering from alcoholism at that time.

The district attorney's records indicate that, during that first meeting on July 12, 1977, Mr. Wenker requested that visitation be included in any agreement regarding child support. On July 13, 1977, the district attorney's office advised him that visitation could not be included in the agreement because the Santa Barbara courts had no jurisdiction over Ms. Solberg (a

---

[1]The record does not include the Washington child support order.

resident of Washington). On July 20, 1977, Mr. Wenker signed an "Order For Support By Stipulation (Uniform Reciprocal Enforcement of Support Act)," admitting $11,000 accrued child support and agreeing to monthly payments of $10 on the arrearage and $150 for continuing support. These payments were to be made to the revenue and trust division of the Santa Barbara County Auditor's office. The order was signed by the court and filed on July 25, 1977.

The district attorney's records reveal that two months later, in September of 1977, Mr. Wenker called to find out whether they had located his daughters. The district attorney's office informed him that that information was "not in yet." Apparently, that information never came.

In 1978, Mr. Wenker fell behind in his payments and the district attorney obtained a salary assignment. Mr. Wenker appeared in pro. per. at that hearing. In 1980, the assignment was modified because Mr. Wenker's elder daughter had reached the age of 18. In 1983, when the younger daughter reached 18, the district attorney noticed a "Motion to Establish Arrears & Modify Wage Assignment" to provide that the salary assignment be raised to $200 per month to pay off the balance of the initial $11,000 arrearage plus interest.

Mr. Wenker appeared, finally with counsel, and requested the "Eradication of Any and All Child Support Arrearage" because of his wife's concealment of the children during the period in which that arrearage accrued. ██ The court ruled that Ms. Solberg "actively sought to conceal from [Mr. Wenker] the whereabouts of the minor children of the parties from 1972 to the present time" and that she was estopped from recovering child support payments for that period. We agree.

Ms. Solberg's first contention is that Mr. Wenker was barred by the doctrine of res judicata from raising the question of denial of visitation at the hearing for a wage assignment because he had had the opportunity to raise that issue no less than three times during the proceedings: in 1977 when he signed the stipulated judgment, in 1978 when the court ordered a wage assignment, and in 1980 when the court modified that wage assignment. We disagree.

The general rules of res judicata do not govern the issue of whether Mr. Wenker may challenge the 1977 stipulation. The crucial question is whether he was denied due process when he executed that stipulation. ██ "[J]udgments for paternity or child support, entered as a result of an agreement between the district attorney and a parent not represented by an attorney, are voidable if the unrepresented parent can establish that he or she

was not advised by the district attorney of the right to trial on the questions of paternity and ability to support and that he or she was unaware of such rights and would not otherwise have executed the agreement." (*County of Alameda* v. *Mosier* (1984) 154 Cal.App.3d 757, 759-760 [201 Cal.Rptr. 550]; *County of Los Angeles* v. *Soto* (1984) 35 Cal.3d 483, 492 [198 Cal.Rptr. 779, 674 P.2d 750]; *County of Ventura* v. *Castro* (1979) 93 Cal.App.3d 462, 467-473 [156 Cal.Rptr. 66].)

 Mr. Wenker met that burden in this case. He had no counsel and was suffering from alcoholism at the time he signed the stipulation. The document contains no express advisement or waiver of his right to a contested hearing and Mr. Wenker testified that he did not understand the consequences of his signing the stipulation. Moreover, although the record reveals that the district attorney informed him "to go to court hearing if he [did not] want to stipulate," that advice came immediately after the child support officer told him that the court did not have jurisdiction over visitation. Visitation, or more properly "concealment," did constitute a defense to the arrearage. It is more than reasonable to conclude that Mr. Wenker would not have simply consented to an $11,000 judgment against him had he known he had a right to contest his liability.

Ms. Solberg suggests that the constitutional challenge sanctioned by *Soto, Castro* and *Mosier* should not be allowed in this case because those cases involved judgments of *paternity* and child support (pursuant to Welf. & Inst. Code, § 11476.1) and not "simply money judgments." She fails to mention that the Supreme Court in *Soto* based its reasoning, by analogy, on *Isbell* v. *County of Sonoma* (1978) 21 Cal.3d 61 [145 Cal.Rptr. 368, 577 P.2d 188], in which the court held unconstitutional the California confession of judgments statutes. Those statutes provided for "simple money judgments." Accordingly, the constitutional analysis is equally applicable here and Mr. Wenker's challenge to the 1977 stipulated arrearage was properly allowed by the trial court.

Ms. Solberg's remaining claim is that the trial court had a mandatory duty to issue the wage assignment pursuant to Civil Code section 4701, subdivision (b) because "denial of the right to visitation" is not a defense to an action to collect child support. (*In re Marriage of Anderson* (1981) 125 Cal.App.3d 553 [178 Cal.Rptr. 117].) That is, as Mr. Wenker points out, a severe over-simplification of the issue presented by the facts in this case.

 It is well established that a custodial parent's interference with the visitation rights of a noncustodial parent does not affect the latter's duty to pay child support. (Code Civ. Proc., § 1694; Civ. Code, § 4382.) The rationale for that rule is that children should not be left without support

because of the misconduct of their parents. However, courts have been instructive in these cases to remind noncustodial parents that they are not without a remedy: "[T]he parent whose rights are in jeopardy may seek enforcement of the judgment, order, or decree in the rendering court. (*Id.,* § 4380.) The *Ciganovich* court identified several appropriate sanctions when the custodial parent acts with an intent to frustrate or destroy visitation rights. These include holding the parent in contempt, terminating or reducing spousal support, and requiring a bond to assure compliance with the visitation order. ([*In re Marriage of Ciganovich* (1976)] 61 Cal.App.3d [289] at p. 293 [132 Cal.Rptr. 261].) Moreover, the court has authority to award a change of custody or to otherwise modify the custody and child support provisions of the original decree. (*Ibid.*; Civ. Code, §§ 4603, 4700.) The deliberate sabotage of visitation rights not only furnishes ground for modification, it is a significant factor bearing on the fitness of the custodial parent. (*Ciganovich, supra,* 61 Cal.App.3d at p. 294.)" (*Moffat* v. *Moffat* (1980) 27 Cal.3d 645, 652 [165 Cal.Rptr. 877, 612 P.2d 967]; see also *In re Marriage of Anderson, supra,* 125 Cal.App.3d at pp. 559-560.)

A noncustodial parent who cannot *find* his or her ex-spouse and children cannot take advantage of these remedies. We think that that difference requires a distinction between "interference with visitation" and "concealment." "Appellant cannot play hide-and-seek with respondent and then recover support payments for that period of time during which she successfully kept her and the children's whereabouts unknown to him." (*Szamocki* v. *Szamocki* (1975) 47 Cal.App.3d 812, 819 [121 Cal.Rptr. 231]; *In re Marriage of Daves* (1982) 136 Cal.App.3d 7, 10 [185 Cal.Rptr. 770].)

Ms. Solberg relies heavily on *In re Marriage of Anderson, supra,* which held that Civil Code section 4701, subdivision (b) mandates issuance of a wage assignment where the statutory showing of two months delinquency is met. However, a careful reading of *Anderson* reveals that the arrearage in question in that case was for a two-year period during which the wife had merely *interfered* with the husband's visitation rights. She was not attempting to collect arrearages for the prior five-year period during which she had concealed her and the children's whereabouts.

■ In this case the trial court found that Ms. Solberg concealed the children from Mr. Wenker from 1972 to the date of the hearing. That finding is supported by substantial evidence. Even though Mr. Wenker did not know where his children were, he paid their continuing support from 1977 when he was contacted by the district attorney until they reached majority. Thus, the paramount consideration of the children's welfare had been fulfilled (*In re Marriage of Ciganovich, supra,* 61 Cal.App.3d 289, 294) and the trial court properly held that Mr. Wenker was not required to put money

into Ms. Solberg's pockets for the period during which she had concealed his daughters from him.

The judgment is affirmed.

Gilbert, J., and Abbe, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 13, 1985.