## CIRCUIT COURT OF FAIRFAX COUNTY

Gail Kurtz Hartman

v.

Michael Hartman

April 13, 1994

Case No. (Chancery) 39827

BY JUDGE THOMAS A. FORTKORT

Michael Hartman and Gail Kurtz Hartman were married in Alexandria, Virginia, on June 22, 1968. One child was born of the marriage, Gregory Bennett, on May 4, 1971. On January 26, 1972, Gail left the marital abode with the child and took up residence with her parents. On June 18, 1973, Michael filed a Bill of Complaint on grounds of desertion, and in the alternative, adultery. Gail's named paramour was Walter Daniel Provance, who at the time was a Fairfax County Police Officer.

Gail responded to Michael's Bill of Complaint with an answer, a cross-bill and a motion for temporary custody of Gregory, alimony and child support pendente lite, and an injunction against her husband to prevent him from interfering with her at her abode. The Court ordered visitation, support pendente lite and joint injunction against both parties for interference against each other.

Gail was awarded a final decree of divorce on her cross-bill of constructive desertion on January 10, 1974. Michael was granted reasonable visitation with her son and directed to pay $100 a month child support.

Shortly after the divorce became final Gail left Virginia and married Walter Provance, who had become a police officer in a small town near Fort Lauderdale. Michael claims his first knowledge of Gail's move occurred when he arrived for visitation with his son only to find an empty apartment.

Michael then attempted to contact Gail through her parents, who responded by seeking and receiving a court injunction barring Michael from further contact with them. Several attempts by Michael to get information from her sister and her brother-in-law were fruitless as each refused to reveal Gail's whereabouts. Michael paid a private detective five hundred dollars to find Gail, but the detective reported no success.

Finally, at Thanksgiving in 1981 or 1982 Michael made telephonic contact with Gail through her sister. He asked to see Gregory but Gail responded that Gregory had his own life and that it would be upsetting for him to discover his birth father. Gail had never told Gregory that Walter Provance was his adoptive not his biological father. Gail avers that she told Michael, Gregory had been adopted by her husband. Michael denies that he was told of the adoption. He did agree to put off meeting Gregory until he was older and more able to comprehend the birth parents' situation.

Recently, Michael discovered that Gregory was a student at James Madison University. After several attempts, he was able to get Gregory's home address in Maryland. Michael, also remarried and living in North Carolina called Gail and asked to meet Gregory. Gail agreed but asked for more time since she still had not revealed to Gregory the circumstances of his birth and adoption. After several days Michael called Gail again. Gregory answered the phone. Michael was told Gail was busy and asked who was calling. Michael believing the person he was talking to was Walter Provance replied "her ex-husband." Gregory dumbfounded responded "Who? Her ex-husband?" Gail took the phone from Gregory and pretended that the call was a wrong number. In response to Gregory's questions she revealed his true parentage. Shortly thereafter, she filed her motion for back child support.

In dealing with any questions of non-support one must first look to the trilogy of cases, now almost thirty years old, of *Newton*, *Cofer* and *Fearon*.

In *Newton v. Newton*, 202 Va. 515 (1961), a husband sought a set-off for mistaken overpayments of child support. Wife had refused husband visitation. The court found that the husband could not vary the terms of decree to suit his convenience. The court found that "to permit him to increase the amount of the specified payments at one time, reduce them at another, and require an adjustment of the differences in the future, would lead to continuous trouble and turmoil. It might result in hard-

ship to a child . . . ." *Newton*, 202 Va. at 519. This indicates the Court's unwillingness to penalize child for the wife's refusal of visitation.

In *Cofer v. Cofer*, 205 Va. 834 (1965), when the wife moved with the children to Pennsylvania the husband argued that visitation became more expensive. Also, the parties had entered into a separate agreement for reduction of support, which was not incorporated into an order of the court. The trial court denied relief to husband. The husband attempted to use the precursor to Virginia Code § 20–108 to argue that the court had the authority to revise or alter a support decree. The court held that the statute did not authorize the court to "relieve the delinquent husband of the payment of accrued installments for the support of his children due under the provisions of a former decree or order." *Cofer*, 205 Va. at 839.

In *Fearon v. Fearon*, 207 Va. 927 (1967), a husband was ordered to pay a sum to the wife for child support, but instead made payments directly to the children or to others for the benefit of the children. The court again denied relief to the husband, considering these payments gifts or gratuities. The court held that "even a court of equity, in an effort to do equity, cannot disregard the provisions of a lawful decree." *Fearon*, 207 Va. at 931, citing *Bradley v. Fowler*, 192 P.2d 969, 975 (1948).

These cases determined public policy in domestic relations cases. It set the primacy of inquiry in custody, visitation and support cases as the issue of support. That choice was not from a callous disregard of visitation rights but a clear recognition that the Court's role was to minimize conflict not accelerate disputes. The court could easily determine whether support was being paid or not paid. By insisting that parties adhere to court orders of support and removing as defenses ancillary issues of custody and visitation, the Court attempted to force these disputes to be heard in court. These cases have served the Commonwealth well although occasionally results are harsh, and more rarely self-defeating. Such a case was *Acree v. Acree*, 2 Va. App. 151 (1986). In *Acree* the mother turned custody of one of the children to the father and agreed that support payments would be suspended during the father's custody of the child. The parties had not reduced their agreement to a court order and husband was not entitled to credit for the period he was the child's custodian under the *Newton, Cofer, Fearon* trilogy. Nevertheless, the Court of Appeals credited the husband with a "non-conforming support payment" for the period he was

the child's custodian. While it is difficult to reconcile *Acree* with prior case law, its result is a clear recognition of the underlying rationale for support payments, i.e. that the *child* is entitled to support for its benefit from both of his natural parents. A strict application of the *Fearon, Newton, Cofer* rule would place the court in the unreasonable position of demanding that a custodial parent, who is bearing both the cost and effort of caring for a child to pay child support to the parent who has relinquished the burden of caring for the child.

*Acree* is a narrow exception and the Court of Appeals has shown no willingness to extend the *Acree* rule. For example, in *Goodpasture v. Goodpasture*, 7 Va. App. 55 (1988), a wife took a job in Louisiana and wrote a letter to the husband's attorney, relieving the husband of the child support obligation for the time the wife and the child would be in Louisiana. The trial court allowed credit for this time and the Court of Appeals reversed, finding it did not fall within the *Acree* exception because this wife did not relinquish custody.

The case before the Court invokes similar policy questions. Virginia has not yet ruled on a case involving a request for back child support where the defendant has asserted a permanent concealment of the child as a defense.

Other jurisdictions which have addressed this situation have considered the wife's intentions (intentional or unintentional concealment), the husband's efforts to locate (thorough or occasional), and the detriment to the child (past due or current support).

For example, *In re Marriage of Daves*, 185 Cal. Rptr. 770 (1982), involved a husband who regularly visited the children and timely fulfilled his support obligation until the wife moved the children away. The husband made efforts to follow court procedures, even to the point of placing a child support modification motion on the docket. The court did not allow the wife to collect child support which accrued between 1971 and 1979, during which time the wife concealed from her husband her location and that of their children. "Under these circumstances, [husband] could justifiably assume [wife] wanted no further contact with him nor any further support payments from him. In the absence of some indication . . . she desired further support payments, he was not required to track her down in order to press that money upon her . . . ." *Daves*, 185 Cal. Rptr. at 771, citing to *Szamocki v. Szamocki*, 121 Cal. Rptr. 231, 236 (1975).

A subsequent case, *In re Marriage of Smith*, 257 Cal. Rptr. 47 (1989), reaffirmed that decision. In *Smith* the decree of divorce contained a provision for $300 per month child support. Contrary to the court order, wife took the children out of state without the husband's or the court's permission. The husband had no contact for four years. "If a parent makes a strong showing of sabotage of visitation rights, as by concealment of the whereabouts of the children, an estoppel or waiver can thereby arise which bars liability for past support payments which would otherwise have been made payable during the period of concealment." *Smith*, 257 Cal. Rptr. at 51.

Likewise in *Cooper v. Cooper*, 375 N.E.2d 925 (1978), the court found that the obligation of a father to support his children may be terminated upon proper showing of the mother's unreasonable interference with visitation, her successful destruction of the father-son relationship, and a showing that the termination will not adversely affect the welfare of the children.

As for the thoroughness of the search to locate one's child in order to pay support, in *Williams v. Williams*, 781 P.2d 1170 (1989), the New Mexico Court of Appeals followed the rule that "denial of visitation is generally not a defense to collection of child support except in those extreme cases where, for example, the noncustodial parent against whom the arrearages are sought to be enforced can prove the noncustodial parent made reasonable efforts to locate the custodial parent." *Williams*, 781 P.2d at 1176.

Such evidence was found insufficient in *Puig v. Ryberg*, 283 Cal. Rptr. 604 (1991), an action brought under the URESA provisions. The husband presented evidence that shortly after their divorce, the wife remarried and moved to another state, that she neither advised him nor the court of her new address, that she enrolled the daughter in school under her stepfather's name, and that the husband tried unsuccessfully to locate the wife and daughter by contacting the wife's mother repeatedly. Even though the father's selective efforts to contact his former wife appeared to have been unsuccessful, the record viewed in the light most favorable to the judgment reflected generalized passivity on his part, a willingness to be free from child support payments rather than that the mother concealed the daughter. *Puig*, 283 Cal. Rptr. at 605. "Saying [husband] sporadically and unsuccessfully tried to locate his former wife and child is not the same, however, as saying [wife] actively concealed [the child] from him . . . ." *Puig*, 283 Cal. Rptr. at

605. Thus, the father could not escape liability for support on that basis.

At trial on this case, Gail and Walter Provance maintained that Michael knew she was moving near to Fort Lauderdale; that as a policeman Walter was easy to find; that in the 1981–82 Thanksgiving phone conversation she told Michael she was living in Virginia Beach.

Contrary to this evidence was the fact that Gregory never used the name Hartman, (Gregory's testimony; his mother maintained Hartman was used in the first and second grade); none of her relatives seemed to know that she was not attempting to hide from her former husband; she sought no child support from Michael; she listed a Maryland address at the time of the adoption by publication although she knew Michael was likely a Virginia resident; she concealed the child's true parentage from the child. Michael first saw Gregory since late 1973 when he entered the courtroom as a witness in this case.

There is testimony that the biological father could have taken stronger steps to assert his visitation rights, that had he looked a bit harder he would have found the wife in Florida.

In this case I find that the husband's efforts to locate the child were reasonable. He contacted other family members who actively stonewalled his efforts. He contacted and paid for the services of a private detective without success. These events occurred in the seventies, before states had begun to adopt the URESA laws and the Parental Kidnapping Act, which provide resources for parents to locate missing children.

I find the mother's actions clearly indicate not only a desire to conceal the child from the biological father but an active attempt to conceal his true birth parentage from the child. The mother gave as her motivation for seeking back child support the fact that the biological father's call triggered questioning by the son which caused her to reveal her former marriage and the fact that his adoptive father was not his birth father.

The Court finds as a matter of law that the past due support payments should not be ordered in this case. The Court bases its decision on two public policy considerations. (1) The Court ought not exercise its equitable jurisdiction to support the active concealment of a child from its birth parent. (2) Ordinarily a Court ought not look into the motivation of parties in filing a law suit, for reasons too plain to enumerate.

In this case, we are asked to punish the biological father for **not** cooperating in a long time scheme to deprive him of his natural **right** to see his child or to have the child even know of his existence. Time and events have removed the Court's ability to remedy this inequity. Assessing child support payments would only add insult to injury, punish the innocent and not provide current support for the needs of a minor child.