[No. G024341. Fourth Dist., Div. Three. Jan. 25, 2002.]

In re the Marriage of LOUIS EDMUND and JUNE MARIE CORDERO.
LOUIS EDMUND CORDERO, Respondent, v.
JUNE MARIE CORDERO, Appellant.

**Counsel**

John J. Gilligan for Appellant.

No appearance for Respondent.

**Opinion**

**SILLS, P. J.—**

### I. Introduction

This case illustrates the harsh effect of the literal operation of our spousal support collection statutes combined with a high rate of legal interest. Our

colleagues in Division Two of this appellate district attempted to ameliorate that harshness in *In re Marriage of Plescia* (1997) 59 Cal.App.4th 252 [69 Cal.Rptr.2d 120], which allowed a common law laches defense to spousal support collection. As we explain below, *Plescia* was "incorrectly" decided insofar as it applied to collection efforts within the old 10-year period that a payee spouse had to renew a support judgment. Even so, the *Plescia* decision represents an effort by the judiciary to temper what can be, in certain cases at least—and the case before us is certainly one of them—some very onerous and inequitable results where a spouse forbears a substantial period of time before attempting to collect on a support order. We therefore recommend to the Legislature that it codify the rule articulated in *Plescia* to allow laches defenses to spousal support collection efforts in appropriate circumstances.

As for the case in front of us, we are spared both the need (a) to apply statutes which would have the result of leaving the respondent, a car salesman who at one point in the early 1990's was only making some $2,000 net per month and paying half of it in child support, practically in a state of indentured servitude or (b) to apply the rule in *Plescia* which, just and humane as it is, runs clearly contrary to the statutory scheme governing support collection law. This case, at least from the point of view of a court that might otherwise be forced to choose between applying a set of draconian statutes or following an erroneously decided case, has a happy ending.

## II. FACTS

Louis and June Cordero were divorced in June 1987; the judgment of dissolution dated June 10 provided that Louis was to pay $1,000 a month in spousal support beginning March 1, 1987, and continuing through December 1, 1987. The amount would be stepped down to $825 a month beginning January 1, 1988, and then continue at that level until January 1, 1997, at which time jurisdiction over spousal support would terminate. Louis was working as a car salesman at the time (all indications are that he continues to do so); June was not working at the time the judgment was entered.

Louis, then living in the family residence, was awarded physical custody of the couple's two children, Vanessa, then almost 10 years old, and Jessica, who was going on eight. The judgment provided that *no* sum of child support was to be paid by June while the children were in the custody of Louis. However, less than two months later, the parties made an agreement to the effect that June would move back into the family residence, the daughters

would live with her, and Louis would pay June $500 per month per child in child support. Soon June began working as a property manager.

Louis kept up his child support payments until each daughter came of age, but did not pay *spousal* support after February 22, 1988. From then to mid-1992, June asked Louis to pay the spousal support order, but Louis kept putting her off by saying he didn't have the ability to pay. Meanwhile, he paid *half* of his net monthly income in child support payments which hadn't been ordered by the court (a fact that would later convince the trial judge that Louis had relied on an agreement relieving him of his spousal support obligation, even though the court found there never actually was an agreement to that effect). After mid-1992, however, June took no steps whatsoever, including any verbal importuning, to collect support.[1]

That is, until August 1997, when June obtained a wage and assignment order indicating an arrearage of about $103,000. About three months later Louis filed an order to show cause, requesting, among other things, that the wage and earnings assignment order be quashed.

There was a hearing in April, and three months later, on July 21, 1998, the court filed a detailed written order, signed by the trial judge and mailed to the parties the next day by the clerk of the court. ▇▇▇ The gravamen of the order was that, under the rule of *In re Marriage of Plescia, supra,* 59 Cal.App.4th 252 *(Plescia)*, Louis was only liable for spousal support arrearages from February 22, 1988, through June of 1992, and he wasn't liable for any support after that. The order specifically provided that Louis owed June 53 months of support at $825 plus interest. (Without interest, the amount was $43,725.)

On August 6—the 15th day after the clerk had served the signed order—Louis (not June, even though she ostensibly had more money at stake) filed a motion entitled "To Vacate Order Per CCP § 663[;] To Set Payment Plan." Basically, there were no new facts in the motion, merely the assertion that the trial court had "misinterpreted" the evidence. Louis argued that the trial judge (a) should have found that the parties had an agreement relieving Louis of any support obligation after February 1988; (b) should not have, under *Plescia*, apportioned the support, but rather applied laches so that June could not collect any spousal support arrearages; (c) should make an order modifying the interest component of the arrearage; and (d)

---

[1]At least according to the facts as found by the trial judge. June would later assert that she continued to press Louis for spousal support as late as 1996. We cover that issue in part III.D. of this opinion.

correspondingly reduce, under Family Code section 290,[2] his monthly obligation.[3]

Louis's motion to vacate and set payment plan was heard on September 4, and resulted in an order, signed, filed and served September 16, 1998. The order (a) denied the motion to vacate, (b) denied the request to find that Louis owed no support arrearage at all, but (c) did relieve Louis of any interest obligation on the amount he had been found to owe. Given that Louis had already paid $12,500 toward the $43,725 principal owing, the new order meant that Louis only owed $31,225, which the court determined should be paid at the rate of $1,000 a month until paid in full.

Now it was June's turn to complain, and two days later, on September 18, 1998, she filed a motion for reconsideration. Her motion was based on (a) the declaration of her daughter that Louis and June had argued about his paying spousal support as late as December 1996; (b) a copy of a letter from June to Louis, dated July 1, 1995, asserting that he still owed support; and (c) the court's supposed error in relieving Louis of the interest on the amount it found he did owe. The motion resulted in a minute order, entered October 30, 1998, denying the motion for reconsideration.

June filed a notice of appeal November 3, 1998, from the orders of September 16 and October 30. On appeal she argues that the trial court had no basis to apply laches under *Plescia* to her conduct after June 1992, because there was no prejudice. She also argues that the trial court abused its discretion by deleting the interest.

### III. DISCUSSION

#### A. *The Problem of the High Rate of Legal Interest as It Affects Support Judgments*

■ The legal rate of interest is 10 percent. (See Code Civ. Proc., § 685.010, subd. (a) ["Interest accrues at the rate of 10 percent per annum on the principal amount of a money judgment remaining unsatisfied."].)

With regard to child and spousal support orders, that means 10 percent interest accrues when *each installment* becomes due and remains unpaid.

---

[2]Family Code section 290 now provides in its entirety: "Subject to Section 291 [which deals with judgments for sale or possession of real property], a judgment or order made or entered pursuant to this code may be enforced by the court by execution, the appointment of a receiver, or contempt, or by any other order as the court in its discretion determines from time to time may be necessary."

[3]Louis's income and expense declaration showed net monthly disposable income as a car salesman of $4,547 a month; he claimed that his monthly debt service, apparently incurred to finance attorney fees, exceeded $3,500.

(E.g., *In re Marriage of Perez* (1995) 35 Cal.App.4th 77, 80 [41 Cal.Rptr.2d 377] [accrued spousal support arrearages " 'are treated like a money judgment' "]; *County of Los Angeles v. Salas* (1995) 38 Cal.App.4th 510, 513 [45 Cal.Rptr.2d 61] ["It is well established that the defaulting parent is required to pay interest on support arrearages as a matter of law . . . ."].)

However, it appears to have escaped legislative notice that, over the past two decades, a large disparity has developed between the legal rate of interest and market returns on conservative investments. The legal rate of interest in section 685.010 of the Code of Civil Procedure was enacted during a period of double-digit interest rates. Since then there has been a major deflationary recession in the early 1990's and, at this writing, a number of interest rates are at lows that haven't been seen since the 1960's. For most of the past decade, for example, passbook savings accounts and money market accounts have paid less than 2 percent. Legal interest on support installments, by contrast, has been set at a point where it is permanently bumping up against the state constitutional provision against usury. (See Cal. Const., art. XV, § 1 [10 percent cap].) To put the relationship between market rates of interest and the legal rate another way: For more than a decade now, it has been more profitable to leave a judgment *uncollected* and let the interest mount up for a while than immediately collect it—assuming, of course, that the judgment debtor is good for it when the judgment creditor tries to collect it.

Now, it makes sense that there should be some disparity between the legal rate of interest on money judgments and the interest a judgment debtor can make by putting money in a savings account. After all, the law wants to encourage judgment debtors to satisfy judgments, so it shouldn't be profitable not to pay a judgment. Imagine the situation if judgment debtors could get a better return by not paying (say the legal rate of interest were 2 percent instead of 10 percent) and forcing judgment creditors to use legal process all the time. Think of all the judgment debtor exams that would soon clog the courts.

But in the area of spousal support collection, the disparity creates the potential for harsh inequity. For example, in a case like this one, a spousal support order is predicated on the fact that the payee spouse doesn't work and the payor spouse has custody of the children. But then there is a change of circumstances that prompts a change in custody. (Here, for example, the children were afforded the stability of being able to continue living in the family home, and keep their friends at school, while the parents changed residences—the law should encourage that kind of postdissolution cooperation, not discourage it.) So the nominal payee spouse goes back to work, and

the payor spouse makes child support payments without a court order (also the kind of cooperation the law should encourage—like the trial judge, we are impressed that Louis paid child support when there was no court order telling him to). But because the payor spouse never gets around to straightening out all these changes by obtaining a new set of court orders, the spousal order continues to mount up at a rate of interest well in excess of inflation.

Now, we could say to Louis, with the imperiousness of Dickens's Mr. Bounderby who, upon hearing the hard luck story of Stephen Blackpool, and in particular that Stephen was patient with his wife even though she was a drunken wastrel (and we certainly intend no parallel here with June) thought to himself, "The more fool you."[4] We could say: "Tsk, tsk, Louis, you could have brought a proceeding to modify the judgment, you didn't, you have made your bed and now you must toss and turn in it. Pay the last farthing, including interest."[5]

But that ignores the basic equities of the case as it developed over the course of a decade, and the more basic reality that for most middle-income people of limited means, legal fees can be prohibitively expensive. The parties had an arrangement that minimized hardship to either of them, so they left an outdated judgment alone.

But furthermore, there is an additional consideration unique to support law: ■ As with child support obligations, spousal support arrearages are nondischargeable in bankruptcy. (11 U.S.C. § 523(a)(5).) Thus while ordinary judgment creditors typically run some risk that the judgment debtor will file a petition in bankruptcy, ex-spouses need not worry and can, in theory, let the interest run up to the heavens. For some folks—and judging by the income and expense declarations in the file this would apply to Louis—large

---

[4] The scene is in the No Way Out chapter (ch. xi) of Hard Times (1854).

[5] Of course, one lesson here is that you get what you pay for when you don't hire a lawyer (in this case, a mess), but in broader terms, the picture the case paints is disturbing: The perceived high cost of legal services kept two ordinary middle-income people from being able to straighten out their respective obligations. Of course, there's nothing new in that: Back to the aptly named book Hard Times: Mr. Bounderby told poor Stephen Blackpool, trapped in a miserable marriage, that there *was* a law that could help him, but it was not for a commoner like Stephen. He could get a divorce if he went to Doctors' Commons, and a court of Common Law, and the House of Lords. "But it's not for you at all. It costs money. It costs a mint of money." (Dickens, Hard Times, *supra*, ch. xi.) In at least some ways for the Louis Corderos and Stephen Blackpools of the world, things haven't changed all that much since the mid-19th century. (Cf. George, *Fair for All*, L.A. Daily J. (Jan. 18, 2002) p. 6, col. 3 ["The inability of individuals to obtain representation, particularly in family law matters, poses special challenges for courts dealing with the needs of pro per litigants. Some 4.3 million individuals represent themselves in our courts each year, usually because they cannot afford counsel"].)

nondischargeable support orders inflated by a 10 percent legal interest rate are the closest thing modern law has to indentured servitude. The result can be simply too Dickensian to bear.

A result too awful to bear was clearly the subtext of the *Plescia* opinion. (See, e.g., *Plescia, supra,* 59 Cal.App.4th at p. 260 ["Equity was specifically designed to step in where the law does not work justice."].) Thus in specific terms the *Plescia* court concluded that laches (the payee spouse doing nothing about his or her rights) *should* be available as an equitable defense in spousal support collection cases, including efforts to obtain a writ of execution within 10 years of the order to be collected on. (See *id.* at p. 259 ["Laches should always be available as a defense under the proper circumstances."].)

*Plescia* arose out of a situation where the payee spouse waited until 1996 to collect support arrears accumulated between 1986 and 1988. With interest, the total amount owing had grown to a relatively tidy sum. Meanwhile, the payor had retired, so his income has been reduced. Collection was a result simply too harsh for either the trial or appellate court to countenance, and so the appellate court affirmed a trial court decision that held that the payee spouse's claim was not enforceable because of laches.

The *Plescia* result makes particular sense in light of the disparity between real world and legal interest rates that have prevailed for over a decade now, and in light of the nondischargeability of support arrearages in bankruptcy. It bevels to smoothness a nasty jagged edge left unfinished in the Legislature's handiwork.

Unfortunately, *Plescia* was surely wrongly decided insofar as it applied to the 10-year period of time a litigant would have, under the law prior to 1993, to renew a support judgment. (Now there is no need to renew support orders at all; see Fam. Code, § 4502.)

The *Plescia* court reasoned this way: Prior to the 1993 enactment of Family Code section 4502 (brought about by Assem. Bill No. 568 in 1992), a laches defense was available to defeat support claims that had otherwise been neglected. (See, e.g., *Plescia, supra,* 59 Cal.App.4th at p. 261 ["the existence of a laches defense to spousal support arrearages has long been recognized"].) The 1993 change—which exempted support judgments from (in the words of Fam. Code, § 4502) "any requirement that judgments be renewed"—did nothing to alter or "supplant" the availability of laches as a defense, so it should remain available in appropriate cases. (See, e.g., *Plescia, supra,* 59 Cal.App.4th at p. 262 ["we conclude that the Legislature's

decision to leave laches out of its legislative scheme allows that remedy to remain available in appropriate cases"].)[6] Therefore, since the payee spouse's delay in *Plescia* was both unreasonable and had caused prejudice, the trial court correctly held that she could not enforce her arrearage claim.

Alas, the *Plescia* opinion erroneously assumed that family law courts *always* had the power to allow the equitable defense of laches in support collection cases *even within the period before which a support judgment had to be renewed.* In fact, this assumption was unfounded. The rule before 1993 was that *laches*, as distinct from other equitable defenses based on the affirmative conduct of the payee spouse, was *not* a defense to the collection of a support judgment for arrearages within the statutory period before a judgment had to be renewed. (E.g., *DiMarco v. DiMarco* (1963) 60 Cal.2d 387, 394 [33 Cal.Rptr. 610, 385 P.2d 2] ["Since plaintiff's rights are based upon a judgment for the payment of money, she can, by the terms of section 681 of the Code of Civil Procedure, *enforce her rights at any time within 10 years . . .* " (italics added)]; *Di Corpo v. Di Corpo* (1948) 33 Cal.2d 195, 201 [200 P.2d 529] ["A writ of execution will issue under [Code of Civil Procedure section 681] as a matter of right upon installments accruing within the [former] five-year period on an ex parte application by the judgment creditor merely showing that such installments remain unpaid."]; *Szamocki v. Szamocki* (1975) 47 Cal.App.3d 812, 818 [121 Cal.Rptr. 231] ["Under Code of Civil Procedure section 681, a wife is entitled to enforce her right of execution upon any installments of support that have accrued within 10 years of the date of her application for the writ."]; *Moniz v. Moniz* (1966) 241 Cal.App.2d 74, 75-76 [50 Cal.Rptr. 267]: ["since the plaintiff's rights are based on a judgment for the payment of money she can, by the terms of section 681 of the Code of Civil Procedure, enforce her rights at any time within 10 years"].)

*Leiden v. Hudson* (1979) 95 Cal.App.3d 72 [156 Cal.Rptr. 849] summed up the law prior to Assembly Bill No. 568: "It is clear that under Code of Civil Procedure section 681, a former wife is entitled to enforce her right of execution upon any installments of child support that have accrued within 10 years of the date of her application for a writ of execution. *This right is not subject to the defense of laches*, nor can the amount be modified, and the only discretion the court has in granting such a writ of execution as to accrued

---

[6]The point was amplified by the same court later in *In re Marriage of Dancy* (2000) 82 Cal.App.4th 1142 [98 Cal.Rptr.2d 775]. "The legislative history of section 4502 showed that the Legislature believed that laches would continue to be available as a defense." (*Id.* at p. 1149, citing *In re Marriage of Fogarty & Rasbeary* (2000) 78 Cal.App.4th 1353, 1363 [93 Cal.Rptr.2d 653].)

installments is to condition issuance of the writ on noncompliance with an order to discharge accumulated arrearages." (*Leiden v. Hudson, supra,* at pp. 74-75, italics added.)[7]

The two cases that *Plescia* relied on for its laches-defense-long-recognized comment, *Rupp v. Rupp* (1954) 129 Cal.App.2d 23 [276 P.2d 144] and *Long v. Long* (1946) 76 Cal.App.2d 716 [173 P.2d 840], didn't allow laches to be asserted as a defense for collection efforts made within the statutory period (i.e., the period before which the judgment needed to be renewed) for arrearages accumulated within the statutory period. *Rupp* merely said that doing nothing within the statutory period could be the basis for a laches defense to a writ of execution *after* the statutory period had passed. (See *Rupp, supra,* 129 Cal.App.2d at p. 25; accord, *Lundgren v. Lundgren* (1965) 238 Cal.App.2d 88 [47 Cal.Rptr. 538] [laches applied where wife let the child support accumulate for 16 years].)[8] And *Long,* in fact, rejected the application of laches in the context of a wife's request for a writ of execution where the statutory period had passed. (See *Long, supra,* 76 Cal.App.2d at pp. 723-724.)

---

[7]Laches should be distinguished from estoppel or waiver. That is, until *Plescia*, the law was clear that a payee spouse always had the right to do nothing for a while so that the arrearages could mount up within the statutory period (and perhaps be worth hiring a lawyer to collect on), but could not do something that might be affirmatively inconsistent with collection. For example, in *Kaminski v. Kaminski* (1970) 8 Cal.App.3d 563, 565-566 [87 Cal.Rptr. 453], a wife had an out-of-state decree and commenced a California action to establish the foreign judgment as a California judgment after she had told her ex-spouse "just stay out of my life and leave me alone." The trial court held, and the appellate court affirmed, that she was estopped to enforce the judgment. *Kaminski* relied on *Graham v. Graham* (1959) 174 Cal.App.2d 678 [345 P.2d 316], which held that in an order to show cause re modification a payor spouse could assert the existence of an agreement to reduce support, and the payee spouse was therefore held to have *waived* her right to amounts above the reduced figure. (See *Graham,* at pp. 683-684.)

Perhaps *Szamocki* best illustrates the difference between simple passive laches of the do-nothing variety and other equitable defenses, which involve affirmative conduct on the part of the payee spouse. In *Szamocki,* within the 10-year period, the wife concealed the couple's child for a period of about two years. The trial court granted a petition to quash a writ of execution for unpaid child support on the ground of laches, and the appellate court, though affirming that result, went out of its way to explain that the use of laches by the trial court was in error. Relying on *Kaminski,* the court explained that the wife was *estopped* from enforcing child support for the period that she hid (she played "hide-and-seek") from the husband. (See *Szamocki v. Szamocki, supra,* 47 Cal.App.3d at pp. 819-820.) Both *Szamocki* and *Kaminski,* to the degree they suggest that concealment of a child creates an estoppel against child support arrearages, are at odds with *In re Marriage of Comer* (1996) 14 Cal.4th 504 [59 Cal.Rptr.2d 155, 927 P.2d 265].

[8]*Rupp* in any event would be trumped by the Supreme Court's rule in *Wolfe v. Wolfe* (1947) 30 Cal.2d 1, 4 [180 P.2d 345]: A "party to a divorce action is entitled to execution as to unpaid installments of a support award on an ex parte application although the application be made more than five years after entry of the decree, provided the execution be restricted to unpaid amounts falling due within the five years immediately preceding the application."

And in fact, *Plescia* went in exactly the opposite direction of what the change in the law in 1993 was intended to do. Assembly Bill No. 568 (Reg. Sess. 1993-1994) emerged out of Governor Wilson's "Vision for Excellence," developed by the state social services department. It was an omnibus get-tough-on-deadbeat-dads bill.[9] The "driving force" behind the legislation was "the difficulty that various district attorneys were having in keeping up with renewal of support judgments, given their huge volume of work combined with shortage of staff." (*In re Marriage of Fogarty & Rasbeary, supra,* 78 Cal.App.4th at p. 1363.) Typical of the bill's support was this letter from the California State Association of Counties, dated August 14, 1992, to then Senator Bill Lockyer: "Every child has the absolute right to support from both parents, yet a large percentage of noncustodial parents either fully or partially evade their child support obligations. CSAC supports AB 568 as a means to greatly enhance counties' ability to enforce those obligations."

The only opposition one finds in the legislative history was from the ACLU, who opposed certain provisions involving privacy (genetic testing, social security numbers on birth certificates)[10] and from the California Association of Black Social Workers, who argued that the various proposals in the legislation were "not people oriented" and would have "a negative impact on poor people."[11]

In sum, the whole point of enacting Family Code section 4502 was to make it easier to collect support judgments, because there was no requirement to renew them every 10 years, not harder, by adding the possibility of a laches defense that hadn't previously existed within that 10-year period.

That said, can anyone who has any sense of justice[12] really deny that laches shouldn't be a defense in appropriate spousal support cases, even in

---

[9]A legislative history of Family Code section 4502 has been prepared by the Legislative Intent Service.

[10]See letter to Assemblymember Speier dated August 18, 1992.

[11]See letter to Senator Watson dated July 29, 1992.

[12]Some lawyers and judges get squeamish over the unqualified term "justice." Perhaps it smacks too much of merely asking "Is it fair?" rather than what the law is. (See, e.g., Clegg, *City of Boerne v. Flores: An Overview* (1997) 2 Fall Nexus: J. of Opn. 5, 14 ["Chief Justice Warren was famous—infamous—for dispensing with legal niceties and asking a litigant before Court: 'Yes, but is it fair'."].) But it is interesting to note that if you type in the word in a computer database of unannotated California statutes and exclude such usages as "administration of justice," "criminal justice" and "chief justice," there are easily more than a thousand times the word appears in the positive law of California. (There are over 200 times when the phrases "miscarriage of justice," "right and justice" and "interests of justice" are used.) Obviously the Legislature on occasion entertains the notion that judges can divine what "justice" is.

the first 10 years after the order is made?[13] (We express no opinion on the more complex issue of whether the defense should be available in *child* support cases. We merely note that Presiding Justice Ramirez made an excellent case in his dissent in *In re Marriage of Dancy, supra*, 82 Cal.App.4th 1142, that the two should be treated differently. (See *id.* at p. 1166 (dis. opn. of Ramirez, J.) ["The noncustodial parent has an obligation to pay child support regardless of whether the custodial parent actively seeks it."].) In the five, six, or seven years prior to the running of the old statutory renewal period, a great deal of interest can mount up.

The equities in the present case bear the point out. Louis used money that was obviously intended initially for support (remember that *he* was the primary custodial parent when the support order was made) to pay child support for which there was no court order. The trial court found that, even though there was no actual agreement relieving him of the support obligation, he honestly believed they had such an agreement, which at least goes some ways to explaining why he never sought modification. June did nothing until the order was about to terminate, and her own income increased during the period (making her vulnerable to a modification proceeding if Louis had been able to finance one). In short, were we to forget *Plescia* and apply the law as the Legislature has crafted it—no laches defense in *at least* the first 10 years[14] after an order is made—an onerous nondischargeable (and in light of the changed circumstances of the parties) substantively unjust burden would be visited on Louis. Like poor Stephen Blackpool in Hard Times, everywhere he would turn there would be a law to crush him.

The obvious solution is to legislatively allow some laches defense to spousal support orders in appropriate cases, like this one. In short, though we think *Plescia* was decided "incorrectly" according to the strict lights of legal logic, we think the opinion represents a better view that should be codified

---

[13]Of course, there is no question that *Plescia* was correctly decided with regard to efforts to collect arrearages after the statutory period had run.

[14]As the trial judge here and the *Plescia* opinion acknowledge, if the statutes are read literally, there is no mandatory renewal period. Given that the rule before the enactment of Family Code section 4502 was that for the 10-year renewal period a payee spouse had an absolute right to collect at any time within the period, one possible reading of the change made by Assembly Bill No. 568, contrary to *Plescia*, is that the Legislature didn't even want the traditional laches defense to collection efforts made *after* 10 years and therefore *did* intend to "supplant" the defense. However, this reading is countered by the parts of the legislative history of the bill, as the *Fogarty & Rasbeary* case points out (see *In re Marriage of Fogarty & Rasbeary, supra*, 78 Cal.App.4th at p. 1363), that demonstrate that the Legislature never intended to disallow a laches defense to "an extremely old [support] order." The whole problem arises because the Legislature forgot, when it eliminated the need to renew support judgments at all, to specify a period during which support orders would be enforceable as a matter of right without any regard to laches.

into statute. Alternatively, the Legislature might want to consider giving trial judges the explicit discretion to relieve interest arrearages, lower the rate of interest on spousal support orders, or reenact former Family Code section 291 (which allowed courts to consider diligence in enforcing a support order)[15] to make it unquestionably clear that a laches defense may be asserted even within the first ten years after an order is made. (The same effect could also be accomplished by revising section 290 to explicitly provide for a laches defense.)

The problem is, as it stands (and particularly after the repeal of former Family Code section 291 in 2000 (Stats. 2000, ch. 808, § 24), there is nothing in the text of the Family Code that allows courts to consider a laches defense. If, for example, all a trial court had was a copy of the Family Code and no case law, it could only conclude that all support installments are enforceable forever without any laches defense, with each unpaid unstallment accruing interest at 10 percent, with nothing to be done about it, no matter how inequitable the result might be in a particular circumstance. If, in addition, the court also had the legislative history of Assembly Bill No. 568, it might conclude that orders more than 10 years old would be subject to a laches defense, but certainly not orders less than 10 years old.

B. *The Court's July 1998 Order, Based on Plescia, Is a Final Judgment and Cannot Be Attacked Now*

 As it turns out, June cannot attack in this appeal the trial court's partial application of *Plescia*. There is no doubt that the time to appeal from the July 21 order began running July 22, 1998, when the clerk mailed the signed order to the parties. Assuming that Louis's motion to "vacate per CCP § 663" was a "valid notice of intention to move to vacate a judgment" under rule 3 of the California Rules of Court, the time "for all parties" to file

---

[15]Former section 291 (added by Stats. 1992, ch. 162, § 10, p. 474), in effect both when *Plescia* was decided and in 1998 when the trial court made its decision, *required* a trial court ("shall consider") to consider a payee spouse's lack of diligence in seeking enforcement of a support order, but—and this was important—it applied only after the initial 10-year period the spouse had to renew the order. ("The lack of diligence for more than the period specified in Chapter 7 . . . .") The *Plescia* court did not question the idea that the *statutory* diligence requirement did not affect the first 10 years (see *Plescia, supra,* 59 Cal.App.4th at p. 259), it merely posited a common law equity doctrine which did.

In 2000, the Legislature repealed Family Code former section 291 because, as the Law Revision Commission Comment notes, it was "surplus" in the wake of the removal of any renewal time period. The commission further noted that the "repeal of this section is not intended to affect the court's authority to make appropriate orders in the exercise of its discretion under Section 290 (methods of enforcement) nor to affect any other equitable powers the court may have" (Cal. Law Revision Com. com., 29C West's Ann. Fam. Code (2002 supp.) foll. § 291, p. 14), and cited, in that regard, *Plescia.*

a notice of appeal from the July 22, 1998 order was extended no longer than 30 days after the entry of the order denying the motion to vacate.[16] The trial court's September 21, 1998 order unequivocally denied the motion to vacate insofar as the partial application of the *Plescia* laches defense was concerned. That is, June's motion to vacate was denied based on the idea that the trial court erred in partially allowing a laches defense under *Plescia*. The September 16 order only modified the prior order of July 21 to the extent that the prior order contemplated interest on the arrearages which the court did say that Louis owed.

The 30-day extension of any time to appeal from the July 21, 1998 order thus expired October 21. June's notice of appeal was filed November 3. The trial court's order partially applying *Plescia* is thus a final judgment and not challengeable in this appeal.[17]

### C. *The Court's Order Relieving Interest on the Arrearages Which It Held Louis Did Owe Was Reversible Error*

The September 16, 1998 order was substantively a *new* order insofar as it relieved Louis of the obligation to pay interest on the $31,225 which it determined he did owe. June had at least 60 days to attack it, and her November 3 notice of appeal is therefore timely.[18] While that notice of appeal could not attack the application of *Plescia* to relieve Louis of about

---

[16]That's under the old rule 3 of the California Rules of Court, in effect at the time June filed her appeal. New rule 3, effective January 1 of this year, makes it even plainer: "If, within the time prescribed by rule 2 to appeal from the judgment, any party serves and files a valid notice of intention to move—or a valid motion—to vacate the judgment, the time to appeal from the judgment is extended for all parties until the earliest of: [¶] (1) 30 days after the superior court clerk mails, or a party serves, an order denying the motion or a notice entry of that order . . . ."

[17]Yes, technically everything we have said in part III.A. of this opinion is dicta. However, consider this: It is better for courts, when they come across statutes which have a harsh or inequitable effect, to candidly point out that fact rather than silently legislating by ignoring, twisting or otherwise distorting those statutes into meaning something they were never intended to mean. If *Plescia* made any real error it was in legislating in the face of hard facts, that is, deciding that a laches defense just *had* to be there because any other result was just too horrible to contemplate. There was no way out for the court to obtain a conscionable result. By contrast, the procedural posture of this case affords us the luxury of being able to point out just exactly what the Legislature was trying to do in Assembly Bill No. 568 and the real effects of that legislation without having to pronounce a judgment which carries out those effects. We write because we have enough confidence in the Legislature to think that it might want to do something about the potentially horrendous results in its general scheme.

[18]California Rules of Court, new rule 3 settles controversies that have rattled around in the Court of Appeal concerning the appealability of orders denying reconsideration. (See generally Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2000) ¶ 2:158 et seq., pp. 2-76 to 2-78; see, e.g., *Blue Mountain Development Co. v. Carville* (1982) 132 Cal.App.3d 1005 [183 Cal.Rptr. 594]; *Rojes v. Riverside General Hospital* (1988) 203 Cal.App.3d 1151 [250 Cal.Rptr. 435]; *In re Marriage of Burgard* (1999) 72 Cal.App.4th 74

five years of support arrearages, it could attack the deletion of the requirement he pay interest.

On this point the error is plain. ■ "The interest on arrears accrues and is payable as a matter of law. Consequently, notwithstanding the obligor's detrimentally changed financial circumstances, trial courts are without authority to waive or forgive interest accrued on past-due child support amounts, just as courts cannot retroactively modify or terminate the arrearages themselves . . . ." (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2001) ¶ 6:508, p. 6-206, italics omitted; see, e.g, *County of Los Angeles v. Salas, supra,* 38 Cal.App.4th 510, 514 ["the trial court erred in concluding Ms. Salas was entitled to a waiver of the interest on the arrearages due"]; *In re Marriage of Perez, supra,* 35 Cal.App.4th at pp. 80-81 [trial court had no authority to eliminate statutorily required interest on unpaid child support arrearage].)

The rule must perforce also apply to spousal support, which is (now at least) treated no differently as far as interest is concerned. Family Code section 290, which was the basis of Louis's request to be relieved of interest, contains nothing suggesting that the trial court has the authority to vary or alter the effects of Code of Civil Procedure section 685.010. It also makes no distinction between child and spousal support orders. (We think the Legislature should consider putting some language to that effect in there, but it isn't in there now.) Family Code section 290 merely counts the ways in which a support order "may be enforced" and says the court may make any other order as the trial court "in its discretion" may be "necessary." It doesn't say anything substantive about the law governing those methods of collection.[19] (See also Fam. Code, § 5100 [providing that support orders may be enforced "without prior court approval"].)[20]

The sum is not insignificant and will probably result in considerable hardship to Louis despite the fact that he got a break for the period mid-1992

---

[84 Cal.Rptr.2d 739].) The new rule treats valid motions to reconsider an appealable order the same way as valid motions to vacate, and allows a 30-day extension after the clerk mails, or a party serves, an order denying the motion.

[19]Family Code section 290 currently reads as follows: "Subject to Section 291 [which deals with orders for the sale or possession of real property], a judgment or order made or entered pursuant to this code may be enforced by the court by execution, the appointment of a receiver, or contempt, or by any other order as the court in its discretion determines from time to time to be necessary." At the time the trial court made its order, the statute did not have the words "Subject to Section 291" and the "any" in front of the "other order as the court in its discretion determines."

[20]In 1998 when the trial court was making its order, Family Code section 5100 began with "Notwithstanding section 291," which is the statute that had traditionally allowed a party's lack of diligence to be considered in enforcing a support judgment. (See *ante,* fn. 15.) In 2000, however, former section 291 was repealed and replaced with a statute concerning orders for real property.

through 1998. In Louis's motion to vacate, he submitted a computer print-out demonstrating that the interest on just the arrearage for the period 1988 through mid-1992 exceeded $35,000—more than the principal. We suspect that in practical terms, the result of today's decision will be to prolong the period during which Louis will have to continue making $1,000 monthly payments to his ex-wife.[21]

### D. The Trial Court Was Well Within the Bounds of Its Discretion in Not Granting June's Motion for Reconsideration

June's notice of appeal attacks both the September 21 order denying the motion to vacate but modifying the interest obligation and the October 30 order denying her motion for reconsideration. The denial of the motion for reconsideration is a simple matter: June showed no "new" facts to indicate that the court should have determined that she was pursuing Louis for her spousal support into the mid-1990's, rather than merely stopped in mid-1992. Both her daughter's testimony and the letter were within her ability to produce at the April hearing that resulted in the partial application of the laches defense.

### IV. Conclusion

The order of July 21, 1998, is final and cannot be attacked. Therefore, Louis does not owe any spousal support after June 1992.

The order of September 16, 1998, is affirmed except insofar as it provides that Louis will not pay interest on the $31,225 in arrearages he was determined to owe. The case is remanded to the trial court in that regard only to make further orders providing for the payment of interest on that amount.

The order of October 30, 1998, is affirmed.

In the interests of justice, each side will bear its own costs on appeal.

Rylaarsdam, J., and Moore, J., concurred.

---

[21]Conceivably, on remand, the trial court could increase or reduce the amount to accommodate the present circumstances of the parties. But while Family Code section 290 allows a court to equitably ration the amount that is actually collected, it cannot make an order that has the effect of forgiving interest or principal that is already owed.