Filed 5/14/13  In re Marriage of Gurney and Kalcheim CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re the Marriage of DEIRDRE DELANEY GURNEY and MITCH KALCHEIM. | B235406 (Los Angeles County Super. Ct. No. BD338904) |
| DEIRDRE DELANEY GURNEY, Respondent, v. MITCH KALCHEIM, Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Donna Fields Goldstein, Judge.  Affirmed in part, reversed in part, and remanded.

Kalcheim Law Group and Mitch Kalcheim, in pro. per.; Greenberg Glusker Fields Claman & Machtinger and Norman H. Levine for Appellant.

Law Offices of Mark Vincent Kaplan, Mark Vincent Kaplan and Jeannette L. Flynn for Respondent.

Mitch Kalcheim (Kalcheim) appeals from the judgment entered in this dissolution action with his former wife, Deirdre Delaney Gurney (Gurney).

Kalcheim raises a number of challenges to the trial court's findings. We find most of his contentions unmeritorious. However, we conclude that the trial court erred in awarding Gurney prejudgment interest and in failing to credit Kalcheim for taxes he paid on post-separation distributions from a company he helped found and manage. We therefore reverse the award of prejudgment interest and the award of Gurney's portion of Kalcheim's post-separation distributions and remand for the trial court to redetermine the award to Gurney. We otherwise affirm.

## BACKGROUND

The parties began living together in July or August of 1992 while they were in law school. They married on June 8, 1996, and the trial court found that they separated on October 31, 2000. Gurney filed a petition for dissolution of marriage on January 31, 2001.

The trial court issued a Final Statement of Decision on May 10, 2011, and final judgment was entered on July 19, 2011. Kalcheim timely appealed.

The following assets were at issue in this case.

1. *Kalcheim's Law Practice*

Kalcheim started a law practice in December 1998. Gurney graduated from law school but never practiced or completed the bar.

2. *Property in Laughlin, Nevada*

In late 1998, Kalcheim's stepfather, Stanley Heller, arranged for Kalcheim to take title to property in Nevada through a foreclosure sale. Kalcheim executed a $200,000 promissory note in favor of Heller on November 30, 1998. At trial, Gurney estimated the property to be worth $2 million.

2

Gurney testified that the Nevada property was a gift to her and Kalcheim from Kalcheim's mother and stepfather. She testified that, after the property was purchased, she had no involvement with the property other than to give one or two tax bills to Heller for him to pay. After the divorce proceedings commenced, Gurney learned that the property was going to go into foreclosure for unpaid taxes of approximately $70,000. She paid half of the $70,000, which represented about three years of unpaid taxes.

Kalcheim did not include the Nevada property in his April 2001 declaration of disclosure of assets. He testified that he had forgotten about his interest in this property. He listed the property in a January 2003 schedule of assets, but he wrote that he owed $125,000 in back taxes and did not include a fair market value because he had been told it could not be determined. He testified that Heller and someone named Albert Grossman told him that the property was worth little to nothing.

While the parties were attempting to settle this case, Kalcheim told Gurney the property was worthless because there was no way to provide electricity and water, so the property could not be developed. He also told Gurney she "could have it," but it would be a liability to her. Kalcheim subsequently told Gurney that the property had been a separate property gift to him alone.

Kalcheim also pressed Gurney to quitclaim the property to him, saying that the divorce would be settled if she did. In 2003, Kalcheim told Gurney that if she did not quitclaim the property, he would create a false promissory note showing that the property belonged to Heller.

Kalcheim and Heller sued Gurney and her counsel in Nevada, seeking to quiet title to the property in Heller's name. The Nevada court ruled that the property was community property and ordered that title be recorded in Kalcheim's and Gurney's names.

### 3. *Westmark and Denvest*

In 1999, Kalcheim and Gurney, with Heller's help, began a business to invest in Danish mortgages. The business was composed of Westmark Capital, an investment fund, and Denvest, which was the managing general partner of Westmark. Kalcheim and Heller jointly managed Westmark through Denvest. The corporate papers for Denvest were filed between June and October 1999, and Denvest began receiving investors' funds in October 1999. Heller, the primary investor in Westmark, initially invested between $1 million and $1.2 million. Kalcheim received seven of the twelve Denvest shares because the business was his idea, and Heller received five of the twelve shares, which were split among his other children and stepchildren. Heller did not keep any shares, instead giving one share each to his children.

Kalcheim testified that Denvest earned a management fee of 20 percent of Westmark's profit and that his seven shares were worth approximately 54 percent of Denvest. He explained that, during the first year Denvest was in business, his role was to learn from Heller, but that his role had grown so that he was working for Denvest on a daily basis on matters that included making the investment and borrowing decisions.

### 4. *Gurney's $290,000 Settlement of Sexual Harassment Lawsuit*

In March 1999, Gurney received a $290,000 settlement in an action for sexual harassment and constructive discharge. Gurney's brother died during the litigation, so she and Kalcheim agreed that she should settle the case in order to have money to help care for her brother's family. Gurney testified that she put the funds in a Citibank account so they could be invested in Denvest. She thought the money was going to be invested in Danish mortgages.

4

5.      *ALM Account and Homer Travel*

At some point before Gurney received her settlement funds, Kalcheim opened an account at ALM, a bank in Denmark.  The parties disputed what their agreement was regarding how to invest Gurney's settlement funds, but the trial court found that they agreed to place the funds in the ALM account, to be invested in Westmark once the fund was started.

On January 11, 2001, shortly before Gurney filed this action, Kalcheim transferred $75,000 from the ALM account to Homer Travel, a corporation owned by Heller that invested in Danish mortgages.  The parties did not dispute whether the transfer occurred, but they disputed whether they received consideration for the transfer.  Kalcheim testified that they received $75,000 worth of Danish mortgages and bonds in exchange, citing a January 15, 2001 statement from ALM.  Heller did not recall the transfer.  The trial court found that Kalcheim did not produce credible evidence that they received Danish mortgages in exchange for the transfer.

## DISCUSSION

"The trial court has broad discretion to determine the manner in which community property is divided, although, absent an agreement, it must be divided equally.  [Citations.]  Accordingly, we review the trial court's judgment dividing marital property for an abuse of discretion.  [Citations.]  In addition, we review the trial court's factual findings regarding the character and value of the parties' property under the substantial evidence standard.  [Citations.]  Ultimately we review characterization issues independently because they are a mixed question of fact and law involving application of the law to facts.  [Citations.]"  (*In re Marriage of Sivyer-Foley & Foley* (2010) 189 Cal.App.4th 521, 526.)  Although the court's factual findings are reviewed for substantial evidence, "[t]he trial

5

court's selection of what legal principles to apply is subject to de novo review. [Citation.]" (*In re Marriage of Ettefagh* (2007) 150 Cal.App.4th 1578, 1584.)

"'"'The finding of a trial court that property is either separate or community in character is binding and conclusive on the appellate court if it is supported by sufficient evidence, or if it is based on conflicting evidence or upon evidence that is subject to different inferences; . . .'" [Citations.]' [Citations.]" (*In re Marriage of Klug* (2005) 130 Cal.App.4th 1389, 1398 (*Klug*).)

"'"'When a finding of fact is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact. [Citations.] [¶] When two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the trial court.'"' [Citation.]" (*In re Marriage of Guo & Sun* (2010) 186 Cal.App.4th 1491, 1497 (*Guo*).) "Appellate courts 'do not reweigh evidence or reassess the credibility of witnesses. [Citation.]' [Citation.]" (*In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 (*Balcof*).)

Kalcheim challenges a number of the trial court's findings and determinations. We address the issues seriatim.


1.   *Lawsuit Settlement Funds*

Kalcheim contends that the trial court erred in awarding the entire amount of Gurney's sexual harassment settlement to her. He argues that the court erred in failing to distinguish between claims that accrued before marriage and those that accrued during the marriage, and that the court erred in failing to count Gurney's post-marriage lost wages as community property. He submitted into evidence Gurney's employment discrimination complaint, which alleged that she was

6

employed by the company from August 17, 1995 to December 5, 1996, and that she was subjected to sexual harassment from her first week of employment to her final day. The parties married on June 8, 1996.

Relying on *Klug*, *supra*, the trial court found that the cause of action arose prior to marriage because the events forming the basis of her claims occurred, "for the most part, prior to marriage." The court further found that the interest of justice required the proceeds to be assigned to Gurney pursuant to Family Code section 2603.[1] We conclude that the trial court did not abuse its discretion in awarding the entire amount to Gurney.

As the trial court reasoned, most of the events forming the basis of her claims occurred prior to marriage. Moreover, to the extent that any of the events occurred during marriage such that the proceeds could be characterized as community property, the statute provides in pertinent part that "[c]ommunity estate personal injury damages shall be assigned to the party who suffered the injuries unless the court . . . determines that the interests of justice require another disposition." (§ 2603, subd. (b).) Thus, under section 2603, the settlement proceeds were properly awarded to Gurney.

Kalcheim also challenges the court's finding that the settlement funds should not have been used for living expenses, which should have been paid from Kalcheim's separate Citigold account. Whether the settlement funds should have been used for living expenses, however, is not pertinent because, as stated above, section 2603 provides for the entire settlement to be awarded to Gurney.

2.     *Management of Settlement Proceeds*

---

[1]     All further statutory references are to the Family Code unless otherwise specified.

Kalcheim challenges the court's finding that he was obligated to invest the settlement funds in Westmark and supervise the funds as a fiduciary. The court noted that the parties disputed how the settlement funds would be invested in 1999 and found Gurney's testimony credible. The court thus found that the parties had agreed that the settlement funds would be placed in the ALM account and then invested in Westmark when the fund was started. The court further found that Kalcheim breached his fiduciary obligations to Gurney by investing the settlement funds in the ALM account rather than Westmark.

Kalcheim argues that Westmark was not in existence when they received the settlement funds and that there was no evidence that the ALM account was an imprudent investment, pointing out that he had invested his own assets in ALM. He also argues that Gurney knew that part of her money was in the ALM account and that she was lying when she testified that she believed all her money was invested in Denvest.

In substance, Kalcheim's argument is that he managed Gurney's settlement funds to the best of his ability and with Gurney's permission, pointing out that he invested the funds in the same manner that he invested his own and community property. The trial court found that Kalcheim breached his fiduciary duty by spending part of the money on the couple's living expenses and by failing to invest the money in Westmark, contrary to Gurney's expectations. The question on appeal is whether there is "any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Guo*, *supra*, 186 Cal.App.4th at p. 1497.) We conclude that the evidence is sufficient to support the trial court's finding.

First, we note that we may not revisit the trial court's credibility determinations on appeal. (*Balcof*, *supra*, 141 Cal.App.4th at p. 1531.) The trial court found Gurney's testimony throughout the trial "generally credible" and

8

Kalcheim's to be "lacking credibility in many respects." We therefore do not address Kalcheim's argument that Gurney was lying when she testified that she believed her money was invested in Denvest.

As to Kalcheim's argument that Westmark was not in existence at the time Gurney received her settlement funds, a document used to impeach Heller showed that investors were being solicited to invest in Westmark in April 1999.[2] Gurney's lawsuit was settled in March 1999. The record thus indicates that Westmark was being formed around the same time as Gurney's sexual harassment lawsuit was being settled.

Gurney testified that she put the funds in a Citibank account so they could be invested in Denvest. Her understanding was that her money was being invested in Danish mortgages. She also testified that she frequently heard Kalcheim tell others that her money was invested in Denvest. Gurney's mother, Anne Delaney, testified that she and her husband invested in Denvest, and that Kalcheim told her that Gurney's settlement funds also would be invested in Denvest. Delaney testified that she and her husband invested in Denvest in October 1999 and sold the investment in 2007, by which time the investment had tripled in value.

Gurney stated that she learned through these proceedings that Denvest was started later, so that her money in an ALM account, which was managed in the same way as Denvest, "seemed to grow proportionately with Denvest." Her understanding was that her money was invested in the ALM account, which was "doing the same thing" as Denvest. She stated that no other property was invested

---

[2] The document was entitled, "Confidential Offering Memorandum," and Heller admitted that it was the offering memorandum that they used to solicit investors, and that it was dated April 30, 1999.

in the ALM account with her settlement funds and that, other than her settlement funds, they always commingled their money in a Citibank account.

Kalcheim testified that $154,690 of Gurney's settlement funds were invested in an ALM account that he opened in 1998 with separate property he received from a $200,000 settlement after he was bitten by a dog. The trial court found that the couple used the other $135,000 for living expenses, and Kalcheim does not contest that finding on appeal.

Kalcheim explained at trial that money was not invested in Denvest, which was only the managing partner of Westmark and did not take investments. He further testified that he never invested community funds in Westmark and never would have done so because participants in Westmark paid a management fee for his expertise in managing the fund, so "why would I pay a management fee to another entity if I'm managing it anyway." Gurney points out that Denvest employed a professional manager, and that she would have had the benefit of professional management had her funds been invested in Westmark.

Although Kalcheim points to evidence contradicting Gurney's testimony, on appeal we review the record for evidence supporting the trial court's finding, whether contradicted or uncontradicted. (*Guo*, *supra*, 186 Cal.App.4th at p. 1497.) The record indicates that Gurney thought Kalcheim was investing her entire settlement fund in Westmark, but, unbeknownst to her, $135,000 was used for the couple's living expenses, and $154,690 was invested in ALM but never moved to Westmark. The record also indicates that Delaney's investment in Westmark tripled from 1999 to 2007. Despite the contradictory evidence cited by Kalcheim, we conclude that there is evidence to support the trial court's findings that the parties agreed to invest the settlement fund in Westmark and that Kalcheim breached his fiduciary duty to Gurney by failing to do so and by using part of the fund for living expenses.

10

3.   *Homer Travel*

Kalcheim contends that the trial court's conclusion that he transferred $75,000 from the ALM account to Homer Travel without consideration is not supported by the evidence.

During trial, Kalcheim testified that the couple received $75,000 worth of Danish mortgages and bonds in exchange for the transfer and submitted a January 15, 2001 statement from ALM. The trial court asked Kalcheim numerous questions about the statement, which was difficult to understand because it was from a Danish bank. The court asked Kalcheim where the statement showed a $75,000 transfer of mortgages or bonds from Homer Travel, and Kalcheim pointed out a deposit of 598.842 Danish krone (DKK), which converted at the time to $75,000. The court asked about the use of a period instead of a comma if the amount was 598,000, and Kalcheim explained that was the practice in Denmark. Kalcheim also pointed out where the conversion rate from Danish krones to U.S. dollars was found on the statement. Kalcheim answered more questions, but the court concluded that the document did not "on its face" show that the couple received consideration for the $75,000 transfer.

On appeal, Kalcheim relies on an April 2001 statement from ALM that shows a deposit of bonds in the amount of 386.350 DKK, plus an amount of 226.865 DKK in an account. The sum of these two amounts equals 613,215 DKK, which Kalcheim asserts to be approximately $75,000. The problem, however, is that this indicates a deposit of only 386.350 DKK, and it does not indicate the January 15, 2001 deposit of 598.842 DKK that Kalcheim testified about at trial.

11

In addition, this is not the January 2001 statement that was discussed at trial.[3] Gurney points out that the April 2001 statement was admitted into evidence by stipulation as to foundation only. We conclude that Kalcheim has failed to establish that the trial court erred in finding that there was no consideration given for the $75,000 transfer.

4.    *Interest Award*

Kalcheim contends that the trial court erred in ordering him to pay Gurney 10 percent annual interest on the total amount he pays her. We agree.

The court awarded Gurney 50 percent of the value of Kalcheim's law practice, plus simple interest of 10 percent per year.[4] In awarding interest, the court relied on *In re Marriage of Watts* (1985) 171 Cal.App.3d 366 (*Watts*) and "common sense," stating that Kalcheim had had the sole use of this asset for nine years. In *Watts*, the trial court found that the husband had the use of the family residence and his medical practice between the date of separation and the date of

---

[3]    Kalcheim contends that the trial court was confused about the exhibit on which he relied to explain the transfer to Homer Travel. It is true that the court mistakenly cited Exhibit HH, rather than Exhibit II, when it stated that it found Kalcheim's testimony regarding the transfer of the $75,000 non-credible. As Kalcheim points out, Exhibit HH was a 1999 ALM statement introduced during testimony about the deposit of Gurney's settlement proceeds. The court's mistaken citation to Exhibit HH does not establish that the court was confused when it found Kalcheim's testimony non-credible. The transcript indicates that the court was not confused about which exhibit Kalcheim was relying on during his testimony. The court examined and questioned Kalcheim regarding Exhibit II, the January 2001 statement, and found that it did not support his claim.

[4]    In addition, the court awarded "10% simple interest" on Gurney's share of each of the post-separation distributions Kalcheim received from Denvest, on the $875,115 award for the court's estimate of the amount Gurney would have received on her $290,000 settlement had it been invested in Westmark, and on $121,750 that Gurney owed Kalcheim for three notes she executed.

12

trial, two years later, but concluded it did not have authority to require him to reimburse the community. On appeal, the court held that the trial court did have authority to reimburse the community for the value of the husband's exclusive use of community assets between separation and trial. (*Watts*, *supra*, 171 Cal.App.3d at p. 374.)

*Watts* does not address the award of interest. It merely required the husband to reimburse the community for the value of his exclusive use of the community assets following separation.

Gurney relies on *Patrick v. Alacer Corp.* (2011) 201 Cal.App.4th 1326 (*Patrick*), in which the wife sued her husband's separate property corporation, its directors, trustees, and trust beneficiaries following his death in 2003. The trial court found that she had a community property interest in the company's increased value during the marriage and awarded her one-half of the increased value, plus prejudgment interest. The appellate court stated that "'[p]rejudgment interest is awarded to compensate a party for the loss of the use of his or her property.' [Citation.]" (*Id.* at p. 1344.) The court relied on Civil Code section 3288, which provides: "In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury." The court thus upheld the award of prejudgment interest, citing the plaintiff's loss of the use of a community property interest for several years. (*Id.* at pp. 1344-1345.)

*Patrick* did not involve a marriage dissolution proceeding, but an action following the husband's death against his corporation. The trial court's award of interest in *Patrick* thus was based on Civil Code section 3288. The trial court here

did not indicate the basis for the award of interest or for the amount awarded.[5] Gurney has not pointed to any provision in the Family Code that authorizes the award of interest at the time the court divides the community assets, and independent research has not indicated such authority. To the contrary, caselaw suggests otherwise.[6] (See *Roy v. Roy* (1938) 29 Cal.App.2d 596, 606 [overturning the trial court's award of prejudgment interest on an award of assets in a divorce action, stating that "[t]he allowance of such interest is not supported by pleading, evidence or finding, and the interest provided by law for judgments would not attach until judgment was entered"].) We therefore reverse the trial court's award of interest on the amount Kalcheim owed Gurney.

5.     *Denvest*

Kalcheim contends that the trial court erred in valuing Gurney's interest in Denvest. The court found that Denvest was created during marriage but that no community property was invested in Westmark, which was created around April 1999 and funded in October 1999. The funds were managed by Heller, Kalcheim, and Jens Schmidt, who received a management fee of 5 percent of Westmark's net interest income. The court found that Denvest was worth $150,000 at the time of trial, and that all of this was community property.

---

[5]     The "statutory interest rate" of 10 percent that expert Stephan Wasserman testified about presumably is that found in Code of Civil Procedure section 685.010. That section, however, addresses the accrual of interest on the principal amount of a money judgment that remains unsatisfied. (See, e.g., *In re Marriage of Cordero* (2002) 95 Cal.App.4th 653 [addressing the accrual of 10 percent interest on unpaid spousal support payments].) The interest awarded here was prejudgment, not postjudgment.

[6]     The only authority we located was the general provision of section 2553 that "[t]he court may make any orders the court considers necessary to carry out the purposes of this division."

14

Kalcheim argues that the court erred in valuing Denvest at the time of trial rather than the time of separation, pointing out that Gurney asked the court to value Denvest as of the date of separation. The trial court valued Denvest at the time of trial, stating that "[a]ny earlier date of valuation was waived by not moving for such different date under . . . § 2552(b)."

The Family Code provides that "the court shall value the assets and liabilities as near as practicable to the time of trial." (§ 2552, subd. (a).) However, "[u]pon 30 days' notice by the moving party to the other party, the court for good cause shown may value all or any portion of the assets and liabilities at a date after separation and before trial to accomplish an equal division of the community estate of the parties in an equitable manner." (*Id.*, subd. (b).) Under section 2552, "the trial court has considerable discretion to divide community property in order to assure that an equitable settlement is reached. [Citation.] 'As long as the court exercised its discretion along legal lines, its decision will be affirmed on appeal if there is substantial evidence to support it.' [Citation.]" (*In re Marriage of Nelson* (2006) 139 Cal.App.4th 1546, 1550.)

Kalcheim did not move to value Denvest as of the date of separation. The court accordingly did not abuse its discretion in valuing Denvest as of the time of the trial. (See *In re Marriage of Hargrave* (1985) 163 Cal.App.3d 346, 355 [concluding that the referee correctly valued property as of the time of trial where the wife failed to move for valuation at the time of separation under former Civil Code section 4800, subdivision (a)].)

In addition to the valuation of Denvest, the court awarded Gurney an interest in Denvest distributions that Kalcheim received post-separation. The court stated that Denvest received 20 percent of Westmark's net income as a management fee and that, post-separation, Kalcheim received $574,578 in management fees from Denvest. The court reasoned that, in order to treat the fees as management fees, it

15

needed to find that Kalcheim's "effort was more than minimal" pursuant to *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842 (*Dekker*). Kalcheim contends that all of the distributions were to compensate him for his post-separation management services and so should have been awarded to him as his separate property.

Relying on testimony by Heller and Gurney's expert, Stephan Wasserman, the court found that attributing all seven of Kalcheim's shares to his management efforts would result in an excessive management fee. The court thus found that two of Kalcheim's seven Denvest shares were for his management efforts and the remaining five shares were for his ownership interest, reasoning that Heller took five shares for his ownership interest, and that this represented a "generous" management fee of 16.6 percent of Denvest's income. The court thus characterized two-sevenths of the gross distributions as Kalcheim's separate property and the remainder as community property. The court awarded Gurney 10 percent interest on her portion of the distributions.

Kalcheim argues that he was entitled to retain the post-separation income he earned from Denvest because it was based solely on his management of the fund. He also contends that he paid taxes on all his earnings, but the court did not reduce the amount to be paid to Gurney or credit him for the taxes he paid. He also points out that Gurney requested only her community property share of the management fees for the year 2000, yet the trial court awarded fees from 2000-2007. We agree with Kalcheim's contention that the court should have credited him for the taxes he paid on the distributions.

Section 771 provides that "[t]he fruits of a spouse's postseparation efforts and skill are his or her separate property [citations]. Therefore, where a community asset increases in value because of a spouse's efforts after separation (e.g., a [community property] business operated after separation), the increase must be apportioned between the community and separate estates. [Citations.]"

16

(Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2012) ¶ 8:350, p. 8-88; § 771, subd. (a).)  Apportionment is required when "more than minimal" effort is devoted to the business.  (*Dekker*, *supra*, 17 Cal.App.4th at p. 851.)

"[I]n valuing the corporate earnings and spouse's salary with regard to a community business operated after separation, 'the apportionment formulas of *Pereira v. Pereira* (1909) 156 Cal. 1 [. . .] and *Van Camp v. Van Camp* (1921) 53 Cal.App. 17 [. . .], must be applied in reverse . . . .  [T]he court must use whichever formula it deems appropriate.  If the court chooses the *Pereira* approach, it "would allocate a fair return of the increase to the community property and the excess would be the husband's separate property."  [Citation.]  If the court chooses the *Van Camp* approach, it "would determine the reasonable value of husband's services (less the draws or salary taken) and allocate this additional sum, if any, to husband as his separate property and the balance of the increase to community property."  [Citation.]'  [Citation.]"  (*In re Marriage of Hargrave, supra,* 163 Cal.App.3d at p. 356.)

"[C]ourts have not developed a precise standard in choosing between *Pereira* or *Van Camp*, but have endeavored to adopt that formula which is most appropriate and equitable under the circumstances.  [Citation.]  The court is not bound to adopt a predetermined percentage as a fair return on separate business capital, nor need it limit the community interest to a salary as reward for a spouse's efforts, but may select whichever formula will effect substantial justice between the parties.  [Citation.]"  (*Dekker, supra,* 17 Cal.App.4th at p. 853.)

Here, the trial court did not abuse its discretion in deciding that two-sevenths of Kalcheim's distributions were based on his management and five-sevenths were not.  Although Kalcheim cites testimony that contradicts the court's finding, again,

we review the record only for evidence that supports the finding. (*Balcof*, *supra*, 141 Cal.App.4th at p. 1531.)

The court relied on the testimony of Heller and Wasserman in finding that attributing all seven shares to management efforts would result in an excessive management fee. Heller testified that Kalcheim solicited investors, drafted documents, approved investments, and managed the portfolio with him. He and Kalcheim did not directly earn management fees, but Denvest earned a management fee of 20 percent of Westmark's net income.

Wasserman testified that Kalcheim was entitled to reasonable compensation for the services he performed for Denvest after separation, but that whether Kalcheim actually did manage Denvest was a contentious issue. Wasserman stated that he and William Mowrey, Kalcheim's forensic accountant, agreed that one percent of the assets under management was a reasonable management fee. According to Wasserman, this percentage meant that Kalcheim should have received about $100,000 in management fees from 2001 to 2007, the post-separation period. Wasserman's testimony is sufficient to support the trial court's determination that two-sevenths of the $574,578 in distributions constituted a reasonable management fee for Kalcheim's post-separation work for Denvest.

Kalcheim also contends that the trial court erred in failing to take into account the taxes he already had paid on the Denvest distributions. The record supports Kalcheim's contention.

Wasserman worked with Mowrey on the valuation of Kalcheim's law practice and Denvest. Wasserman testified that, in determining the community property interest in the post-separation distributions, he subtracted $265,169 in taxes from the $574,578 total distributions, resulting in $309,409 in net distributions. Mowrey also testified that the community interest in the Denvest distribution was subject to the taxes Kalcheim paid. However, Schedule 3, which

18

Wasserman prepared and on which the court relied to determine Gurney's interest in the distributions, was based on the total amount of $574,578, not the net after-tax amount.

Gurney contends that Kalcheim did receive credit for his payment of income taxes, but the citation she provides does not support her contention. She cites Wasserman's testimony that he reduced the valuation of Denvest for taxes, but this was for the $150,000 valuation of Denvest, not for the value of the distributions that Kalcheim received post-separation. Kalcheim's post-separation distributions from Denvest are a different asset from that discussed in Wasserman's testimony, and his subsequent testimony regarding the post-separation distributions indicates that the taxes Kalcheim had paid should have been deducted in calculating Gurney's interest in the post-separation distributions.

The calculation of Gurney's interest in Kalcheim's post-separation distributions should have taken into account the taxes Kalcheim already paid on the distributions. We therefore set aside the trial court's award of $324,738 to Gurney and remand for the court to redetermine the proper amount, taking into account the taxes Kalcheim already paid on the distributions.


6.    *$30,000 Payment from Kalcheim's Mother*

Kalcheim contends that the trial court erred in awarding Gurney half of a $30,000 payment he received from his mother for supervising the remodeling of an apartment she owned in New York. The court characterized the $30,000 as community property, saying that Kalcheim described it as "profit from the sale of his mother's condominium since he helped sell it."

Kalcheim argues that the trial court should not have treated the $30,000 deposit as a separate asset of the couple's because the uncontradicted evidence was that he deposited it in the couple's community property ALM account. The trial

19

court found that Kalcheim failed to present evidence of the $30,000 deposit because the statement he provided was in Danish, and he did not provide any translation of the document. The court also found that Kalcheim's testimony regarding the $30,000 was "less than candid," stating that he "testified that he received these funds, then that he did not, then that they were for work he did on the property sold, then for something else."

Kalcheim testified that when his mother sold the apartment, she gave him $30,000 because he helped supervise construction work that was done on the apartment. He deposited the $30,000 in the parties' ALM account. He later testified that part of the $30,000 was repayment for money he had spent for the renovation and part of it was a gift. He also testified that he did not disclose the $30,000 separately because it was on other income documents or tax returns. He received the payment in 2003 or 2004. Gurney's counsel read an excerpt of Kalcheim's deposition testimony, in which he stated that he received nothing from the sale of the property, but Kalcheim stated that the deposition was taken before he received the payment.

The record supports the trial court's findings. Kalcheim's testimony regarding the reason for the payment was inconsistent, and the court reasonably found Kalcheim's testimony that he deposited the $30,000 in the ALM account was not credible. We may not revisit the court's credibility findings regarding Kalcheim's testimony and, although there may be contradictory evidence, on appeal we do not have the authority to substitute our deductions for those of the trial court. (*Guo*, *supra*, 186 Cal.App.4th at p. 1497.)

7.    *Attorney Fees*

Kalcheim's final contention is that the trial court erred in awarding attorney fees to Gurney. The court indicated in its Final Statement of Decision that it would

20

award attorney fees to Gurney on the basis that Kalcheim breached his fiduciary duty to Gurney under section 1101, subdivision (a). However, Gurney points out that the attorney fees and sanctions issues were bifurcated from the property issues on the first day of trial. The court therefore did not order the payment of attorney fees in the decision that is on appeal. Because Kalcheim did not file a notice of appeal from the order of attorney fees, we are without jurisdiction to consider it. (Cal. Rules of Court, rule 8.100; Code Civ. Proc., § 906.)

## DISPOSITION

The trial court's award of interest on the amount Kalcheim owes Gurney and its award of $324,738 as Gurney's portion of Kalcheim's post-separation distributions from Denvest are reversed, and the matter is remanded for the trial court to redetermine the amount Kalcheim owes Gurney. In all other respects the judgment is affirmed. Each side to bear its own costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, J.

We concur:

EPSTEIN, P. J.          MANELLA, J.

21